# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO
# Judge Robert E. Blackburn

Civil Action No. 06-cv-01881-REB-CBS

RAYMOND E. JACKSON,

    Plaintiff,

v.

JOHN E. POTTER, POSTMASTER GENERAL,

    Defendant.

## ORDER DENYING DEFENDANT'S MOTION FOR REMITTITUR

**Blackburn, J.**

The matter before me is **Defendant's Motion for Remittitur** [#96], filed July 10, 2008. I deny the motion.

## I. JURISDICTION

I have subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question).

## II. STANDARD OF REVIEW

"It is a fundamental legal principle that the determination of the quantum of damages in civil cases is a fact-finder's function. The trier of the facts, who has the first-handed opportunity to hear the testimony and to observe the demeanor of the witnesses, is clothed with a wide latitude and discretion in fixing damages, pursuant to the court's instructions, deemed proper to fairly compensate the injured party." ***Bennett v. Longacre***, 774 F.2d 1024, 1028 (10th Cir. 1985). Thus, in all but the most extreme and unusual circumstances, a jury's award of damages on a duly entered verdict is inviolate. ***Blanke v. Alexander***, 152 F.3d 1224, 1236 (10th Cir. 1998). The movant's

burden is accordingly a heavy one. **Murphy Oil USA, Inc. v. Wood**, 438 F.3d 1008, 1021 (10th Cir. 2006). Remittitur is indicated only when "the jury award is so excessive . . . as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or another improper cause invaded the trial." **Id.** (quoting **Sheets v. Salt Lake County**, 45 F.3d 1383, 1390 (10th Cir.), **cert. denied**, 116 S.Ct. 74 (1995)) (internal citations and quotations omitted)).

### III. ANALYSIS

Defendant argues that remittitur is required in this case because the jury's award was not supported by substantial evidence. He points out that the $200,000 in compensatory damages awarded was 1,000 times the amount of economic damages proven.[1] Such easy mathematical calculations are not dispositive, however. Rather, I must consider the totality of the circumstances. **See Smith v. Northwest Financial Acceptance, Inc.**, 129 F.3d 1408, 1416-17 (10th Cir. 1997). "[T]he amount of damages awarded by a jury can be supported by any competent evidence tending to sustain it." **Bennett**, 774 F.2d at 1028. Under this standard, even though plaintiff's own testimony was "not exceedingly graphic or detailed," the evidence as a whole was more than sufficient to support the jury's verdict. **Smith**, 129 F.3d at 1416.

---

[1] Although defendant also notes that plaintiff requested only $50,000 in damages, plaintiff's counsel repeatedly told the jury that she did not know precisely what amount of damages would make plaintiff whole for the treatment he suffered at the hands of Shelby Broadway. She suggested as an example that the jury consider compensating him based on each of the 53 miles he had to drive to and from work every day. (Tr. 403-404.)

Defendant further claims that improper influence is shown by an unsigned letter ostensibly sent by the jury foreman to the Postmaster General stating the jury's award was intended to "send a message" to the postal service that discrimination in the workplace would not be tolerated. For reasons already set forth in my **Order Denying Defendant's Motion for New Trial** at 6-8 [#121], filed November 20, 2008, I do not find this argument any more persuasive here than it was in that context.

The working atmosphere under supervisor Shelby Broadway was described variously as "volatile and dangerous" (Tr. 170), "very tense and very hostile" (Tr. 252) "intimidating" (Tr. 147), "disrespectful" (Tr. 172), "poisonous" (Tr. 118), and punishing (*see* Tr. 254-255).  Although defendant elicited evidence that Broadway's style of management affected all employees at the Valmont Station, there was sufficient evidence to suggest that Broadway singled plaintiff out for particular negative attention. Gregory Kuehl testified that whereas other employees would come under Broadway's scrutiny only sporadically, she would confront plaintiff "[w]eekly or daily."  ((Tr. 147-148.) Joy Phoonswadi averred that plaintiff was one of Broadway's "favorites," meaning he was one of the "people that she didn't like very much, and those became her favorites because she paid more attention to people that she felt were more – I guess troublesome or whatever it was in her eyes that she didn't like."  (Tr. 255.)

Evidence of Broadway's actions towards plaintiff bore out these opinions. Although Kuehl testified that it had been more convenient to have plaintiff perform his duties from a station on the workroom floor (Tr. 145), Broadway moved him to a back office and required him to position his desk with his back to the door.  When he asked about the strange furniture configuration, Broadway told him "because when I walk by that office I want to be able to see you."  (Tr. 58.)  This was not idle talk, either, as co-workers frequently observed Broadway either staring intently at plaintiff from the doorway to his office or peeping at him from behind postal cases on the workroom floor. (Tr. 63-64, 167-169.)[2]  Co-workers took to calling plaintiff on their cell phones to alert

---

[2] This despite the fact that Broadway was not plaintiff's direct supervisor and was not supposed to be out of the workroom floor. (Tr. 140, 251.)

him to Broadway's scrutiny, and one co-worker gave him a mirror so he could see when Broadway was watching him from the doorway. (Tr. 58-59, 63-64.)

Despite defendant's assertion that these changes were intended to make plaintiff's work more productive, the evidence supported the opposite conclusion. Broadway changed plaintiff's schedule and work responsibilities frequently and made it difficult for him to do essential functions of his job by, for instance, moving a computer he required to track mail to a locked area. Plaintiff testified that he often had to "sneak around" to do aspects of his job because Broadway insisted he be in his office at all times. (Tr. 60-61.) Phoonswadi reported that Broadway "was pretty determined to make it evident to most of the people I think that worked on the floor that she wanted Ray Jackson to do something that he was unable to do. And she kept insisting." (Tr. 263.)

In addition, Broadway's direct interactions with plaintiff were properly characterized by his co-worker, Patrick Selix, as "very disrespectful." (Tr. 172.) When plaintiff refused to sign a proposed job offer with which Broadway presented him in the absence of his union steward, as was his right, Broadway told him "to be a man once in [his] life and take up for [himself]." (Tr. at 54, 194.) Broadway made comments about plaintiff to others on the workroom floor in a "derogatory" and "sarcastic" tone. (Tr. 119.) Broadway "blew up" and threw a wadded up piece of paper at plaintiff when he questioned her as to why he was required wear a carrier's uniform. (Tr. 68-69.) Plaintiff felt compelled to file EEO complaints against Broadway because she would cut him off and walk away when he tried to talk to her. (Tr. 64.) Unfortunately, Broadway's prediction that plaintiff's grievances were "not going anywhere" proved prescient. (Tr.

83.) Little changed as a result of his complaints, and although Broadway was directed at one point to treat plaintiff with dignity and respect, her behavior towards him was unaltered. (Tr. 73, 76, 230.)

Moreover, Broadway's demeanor on the stand did little to enhance her credibility. Defendant's portrayal of Broadway as a harsh micro-manager who was roundly disliked by all certainly cannot be gainsaid. Nevertheless, she also admitted that she believed plaintiff in particular was performing "makeup" work (Tr. 199), despite the fact that she did not appear to have a firm grasp of what he actually did prior to her arrival at the Valmont Station. She claimed that she was disliked because she "was asking [employees] to perform their duties and to actually do their jobs," but did not specify how plaintiff was failing in these respects. (Tr. 219.) The jury was certainly permitted to infer from her appearance on the stand that she believed, without just cause, that plaintiff was lazy and unwilling to work. It likewise was well within its purview as fact finder to conclude that plaintiff's twenty-one year career in the United States Air Force and decade of uneventful service in the post office prior to Broadway's arrival at the Valmont Station belied such a characterization of his work ethic.

Against this background, plaintiff's testimony as to his emotional and psychological damages, although "not exceedingly graphic or detailed," was substantiated by the totality of the circumstances and, therefore, sufficient to support the jury's verdict. Plaintiff testified that as a result of Broadway's actions and attitude toward him, he was required to start taking medication for high blood pressure for the

5

first time in his life. (Tr. 65-66.)³ Although plaintiff's demeanor on the stand was calm and stoic, it was clear that he was frustrated at his inability to get any relief from those higher up the supervisory ladder despite repeated requests for help.

It also was clear that plaintiff's job was important to him, not merely from a financial standpoint, but as an indication of self-respect and self-worth. Prior to his career with the post office, plaintiff served for twenty-one years in the United States Air Force, first as a firefighter and eventually fire chief. (Tr. 32-33.) Plaintiff worked for a decade with the post office prior to Shelby Broadway's arrival at the Valmont Station, during which time no other manager had ever reported a problem with him, and he had never filed an EEO complaint. (Tr. 138, 83.) A person would be rightly justified in taking pride in such an employment history, and plaintiff testified cogently that his job "means my life." (Tr. 84.)

I am unwilling to say that plaintiff's dignity is worth less than the $200,000 the jury awarded here. It certainly does not shock the conscience of this judicial officer.

**THEREFORE, IT IS ORDERED** that **Defendant's Motion for Remittitur** [#96], filed July 10, 2008, is **DENIED**.

Dated November 21, 2008, at Denver, Colorado.

**BY THE COURT:**

**s/ Robert E. Blackburn**
**Robert E. Blackburn**
**United States District Judge**

---

³ Although defendant objects that this testimony is improper both as lay opinion and as hearsay, he did not object on those, or any other, bases at the time of trial.